Now, if everybody is with us and unmutable, I'll call the case of Darren Mickell v. the NFL Players Retirement Plan. May it please the Court. Good morning, Your Honors. My name is Alyssa Paulino Grisham and I represent the appellant, Darren Mickell. Today we will be discussing three reasons that the District Court erred in finding that the plan's claim decision was reasonable. First, the plan surrendered its discretionary authority to its paid evaluators and failed to provide a reasoned basis for the blanket discount of Mr. Mickell's evidence. Second, the plan failed to consider the combined impact of all of Mr. Mickell's impairments during the claim review. And third, the plan employed an unreasonable interpretation of total and permanent disability, which ignored the plain meaning of the wage threshold language, rendered it largely meaningless, and inserted limitations. Turning to the first issue, the plan automatically adopted its retained evaluators' opinions and failed to give a reasoned basis for the wholesale discount of Mr. Mickell's evidence. In the denial letter, the plan failed to critically examine any of Mr. Mickell's evidence and instead asserted a blanket discount of all of it, declaring that it placed more confidence in its evaluators' report. Now, the plan's only explanation for doing this was that it uniformly accepts and relies on its evaluators' opinions when it renders claim decisions. This makes clear that no matter what evidence Mr. Mickell submitted, the plan's policy was to reflexively adopt and defer to the conclusions of its retained evaluators. In Dimry v. Burtbell, the Northern District of California determined that the plan abused its discretion when it employed this exact same automatic deferral policy using the same language, explaining the denial was based upon an unreasonable bias in favor of plan-selected positions. Although it noted potentially conflicting evidence, it didn't resolve those conflicts by actually examining the evidence. It simply adopted the opinions of its retained physicians by default, and then it underscored the reflexive and non-discretionary quality by stating that it uniformly accepts and relies on the reports of its retained doctors. Just as this Court should find, the District Court held that the plan was not entitled to decide a benefits claim by default to plan-selected physicians because this is the abandonment of the plan's discretion. Now, this Court's decisions in both Oliver v. Coca-Cola and Caviani v. Reliant Standard are instructive. Similar to the administrator in Oliver, the plan's failure to critically analyze or even mention most of Mr. Mickles' evidence supporting his disability in the denial letter, including an extensive objective functional capacity evaluation report and neuropsychological testing, indicates that the plan did not choose to credit conflicting reliable evidence over Mr. Mickles. It simply arbitrarily ignored his evidence. Further, in Caviani, this Court explained that administrators cannot discount a claimant's evidence without providing a reasoned basis. A policy of reflexively adopting its retained evaluators' opinions is simply not a reasoned basis for the wholesale discounting of Mr. Mickles' evidence. Now, in its brief, the plan asserted that the claim review was fair because its retained evaluators were given Mr. Mickles' evidence. But this is both legally and factually flawed. First, if we assume that the plan's evaluators were actually given all of Mr. Mickles' evidence, this does not alleviate the plan's obligation as the fiduciary to consider this evidence and render the claim decision. While the plan must consult with appropriate professionals, it was not permitted to automatically defer to them. Second, the plan's paid evaluators did not actually consider all of Mr. Mickles' evidence. None of them even discussed or acknowledged the functional capacity testing conducted by Dr. Craig Lichtblau or Peggy Vermont's psychological assessment and testing. So this evidence never truly factored into the plan's claim decision or its evaluators. Turning to the second issue, the plan failed to consider the combined impact of all of Mr. Mickles' impairments during the claim review. And it's never even disputed this point. Instead, its only argument is that it would be somehow inappropriate for its paid evaluators to consider Mr. Mickles' condition as a whole, admitting that each considered the specific impairment it assigned to them only in a silo. But again, the plan's argument... But they don't seem to address the durational requirement, that the condition is going to last more than 12 months. That the condition is going to last more than 12 months. All of Mr. Mickles' physicians indicated that he was disabled and it would likely impact his ability to secure and maintain gainful employment. But no, Your Honor, they were never asked whether he would be able to maintain gainful employment for longer than... or not be disabled for longer than 12 months. However... If that's the case, and the seven plan evaluators all concluded that he was not disabled, isn't that enough for us to review and declare that substantial evidence supports the plan's determination? No, Your Honor. And if we look back at Mr. Mickles' evidence, Mr. Mickles, in particular, Peggy Vermont's report, Peggy Vermont indicated that it would be very difficult for Mr. Mickles to maintain gainful employment given the severity of his psychological conditions. While she wasn't specifically asked, can he work... will this last for 12 months, she did explain the severity of those conditions and that it wasn't going away anytime soon. Also, Dr. Todd explained that it would be difficult for Mr. Mickles to maintain gainful employment given all of his conditions. And Dr. Licklau indicated that Mr. Mickles was unable to engage in any gainful occupation at this time. All seven evaluators... But he said at the time, did he not?  One of them used that phrase, which kind of caught my eye. Dr. Licklau did not indicate that it would be at this time. He just specifically indicated that Mr. Mickles was unable to engage in any occupation. Now, Peggy Vermont indicated that his current condition and if there were things, you know, his current condition was not fully disabling. I mean, was fully disabling and that she was concerned that any interventions that he engaged in would not fix it because of the likelihood of brain injury. Right. And so she... I see the references in both Dr. Todd's and in Ms. Vermont's conclusions. Todd says that Mickles' symptoms make competitive employment at this point quite difficult. And then Ms. Vermont says Mr. Mickles is not deemed employable at this time. That doesn't really address the durational component, does it? Your Honor, in this... Yes, Peggy Vermont said at this time. However, what she was stating is that she was concerned that any interventions that he engaged in would only have minimal impact. And that's because there's this concern about brain damage due to the impacts that he's had over the years. Now, the durational issue, not any of the plan's evaluators indicated any durational issue. What they each did was consider... Because they all found him not disabled, right? So if that's the case, then as of this day going forward, he's employable. No, Your Honor. They indicated that he was not disabled from the single impairment that they were assigned to assess. But several of the plan's own evaluators indicated that he may be disabled from other issues. Dr. Macchiotti said that he couldn't... That there was clinical evidence that he may be disabled from a psychological condition that... A severe panic disorder or depression. And that's the issue with this... Counsel? Counsel? Yes, Your Honor. Does TTE improve with time? Absolutely not, Your Honor. Every one of the conditions that... The condition that Mr. Nickel has been... TTE is not something that can be diagnosed while a patient is living. However, there is a suggestion that he has TTE. But there is definitely the suggestion that he has brain damage due to the multiple injuries that he suffered, which will not cure over time. In fact, Peggy Vermont specifically stated, and so did Mark Todd, that the concern was that this will not get better because there may be an underlying issue with his brain injury. Thank you, Your Honor. Now, what's important to remember here is that each of the plan's evaluators only considered the specific impairment it assigned to them in a silo, which the plan acknowledges. Since the plan has stated that the only reason that it denied Mr. Nickel's claim is that it relied on these same siloed reviews, at no point in this claim evaluation did any party, not the plan or its evaluators, consider the combined impact of all of Mr. Nickel's impairments on his ability to meet the definition of disability. And as in the Seventh Circuit's case, Laco versus Mutual of Omaha, the plan's failure to consider and address the combination of all of Mr. Nickel's impairments on his ability to meet the definition of disability amounts to arbitrary decision-making and cannot stand. And we have a very good illustration of just how unfair it was to assess Mr. Nickel's comorbidities in isolation in how the plan handled Dr. Faber's report. Faber was hired by the plan to evaluate Mr. Nickel's psychological condition and concluded that he had psychological difficulties, which impacted functioning, but believed that he was capable of at least some kind of employment. And when asked what type of employment, he only listed one job that Mr. Nickel could do, assist in a sports program for the youth. Now, the plan accepted this without ever going back and assessing it in relation to all the other evidence. For example, the plan never went back and considered whether Mr. Nickel had the physical ability to assist in a sports program for the youth or, given the fact that its own paid evaluators, Arlissaurus, Conazaurus, and June, collectively indicated that Mr. Nickel was unable to engage in repetitive kneeling, squatting, and climbing. He had to alternate sitting and standing, could only walk short distances, and, according to June, was limited to effect sedentary activity. A truly full and fair review required the plan to go back and finish its review to consider whether the combination of all of Mr. Nickel's impairments were working together. Thank you, Your Honors. If Your Honors do not have any more questions, I have reserved the remainder of my time for rebuttal. We'll hear from you on rebuttal. Thank you. Good morning, Your Honors. This is Mayor Plea for the Court. This is Michael Junk on behalf of the retirement plan. I had also intended to address Mr. Nickel's three arguments in order, the first being the argument that the Board abused its discretion by ignoring evidence, all of the evidence allegedly, the second argument that the Board abused its discretion by failing to consider what's called the cumulative effect of Mr. Nickel's impairments, and the third argument being that the Board abused its discretion by misapplying the plan's total and permanent disability provision. And that relates to the $30,000 income provision. So starting in that order, the Board is accused here of ignoring all the evidence, and I would submit that's not a fair characterization of the record in the case. At the risk of stating the obvious for the Court, the Board is not a panel of expert medical physicians. It's a Taft-Hartley Board composed of three individuals appointed by the NFL Management Council and three former players, like Mr. Nickel himself, who are appointed by the Players Association. Both sides of the Board rely on neutral physicians to review records, evaluate players, and answer the dispositive question whether the player is capable of any employment, whether he's totally and permanently disabled. The Board's approach here, I think, is hardly unusual or unreasonable. Fiduciaries are, of course, expected to rely on experts across many areas, from investment advisors to tax advisors to medical experts, as in this case. Neutral physicians here are undisputably instructed to and trusted by the Board to conduct full and unbiased evaluations. The trust placed in them is exemplified by the fact that the plan document says neutral reports are to be substantial factors in the Board's decision. So, in all fairness, I think that's what happened here. The Board reasonably consulted and relied on the findings of seven plan-neutral physicians who personally evaluated Mr. Nickel. That's true for every one of them. They all reviewed what records were made available to them at the time, and they reported that he was capable of employment and that he was not totally and permanently disabled. Mr. Nickel's argument on this point seems to turn on perceived shortcomings in the Board's final decision letter. The decision letter is meant to convey the decision, the basis for it, and cite the plan provisions on which the decision is based. The decision letter accomplishes that. It explains in straightforward terms to be understood by any participant that the Board found Mr. Nickel was not totally disabled or permanently disabled based on the conclusions, as I said, of seven plan-neutral physicians who evaluated him, reviewed the records, and gave their reports. According to the late Justice Ginsburg, and this is from the Nord, Black and Decker decision, the Board does not have a discrete burden of explanation, meaning it doesn't have to detail every reason why it disagrees with the evidence submitted by a participant when there is credible evidence supporting a contrary conclusion. And that's the principle at play here. We have seven, again, neutral physicians who evaluated Mr. Nickel, reviewed the records, and rendered independent opinions. I think the chief distinguishing feature... Counsel, I'm sorry. I have a question. This is Robin Risenbaum. First of all, was the decision made by the Board at its August 2015 meeting? I'm sorry, Your Honor. I didn't quite hear the last part of your question. Was the decision made by the Board, say again? At its August 2015 meeting? Those are the minutes that reflect the denial. That's why I'm asking. Oh, if that's the date. I don't have those minutes in front of me, Your Honor. So the reason I'm asking is because for that date, I couldn't find where the Board attachments or the denial letter mentioned or discussed the Todd or Lichtblau decisions. And I was just wondering whether you had any information on that. No, I'll concede that the decision letter does not specifically reference the Todd and Lichtblau evidence by name. What the Board's decision letter does is it cites directly to the evidence supporting its conclusion that Mr. Mikkel was not totally and permanently disabled. And it discusses, as I said, in straightforward language, points to that evidence supporting its decision. I have another question for you, if you don't mind. I apologize for the thunder in the background here. My question for you is this. Let me ask you, can he reapply for benefits now that he has received Social Security benefits? Or once you apply, you're done? How does that work? No, ma'am. He can and he did reapply. This is not in the record. It wasn't before the district court. It's alluded to in the briefing. But he was permitted under the terms of the plan to reapply. He has since done so. Thank you. Yeah. This is Beverly Martin. I always like it when I have somebody that knows a lot more about this topic than I do. So is there some... I mean, is it the philosophy of the NFL in this plan to give more attention to active players than retired players? Or what is... Is that built into this plan? Or what's your view about that? Or what's the NFL's view about that? Well, not speaking on behalf of the NFL, I represent the plan, which is the technical... Right. Well, okay. But I will say, I'm not sure what you're driving at with the question. This plan, the retirement plan, provides retirement and sort of post-play benefits to, in the welfare context, disability benefits to retired... Okay. Well, let me see if I can make it clearer. So under 5.4 special rules, it seems to say... It seems to give a more liberal route for finding psychological disability to active players than retired players. Is that right? I mean... You're citing plan section 5.4? 5.4B, because part of his claim is a psychological or psychiatric disorder, but it says that you have to proceed under 5.3, which as I understand it, relates only to active players. I apologize, Your Honor. I'm looking at Record Appendix 54. That's the total and permanent disability section. And I'm looking at Section 5.1. 5.3 appears on... It talks about re-evaluations. What I'm looking at is Document 52 on the docket entry in the district court, so I don't know. Maybe I've got the wrong document. I'll just try it this way. I have some sympathy for Mr. Mikkel's argument that the board seemed to consider each one of its doctors' opinions in a silo. So you've got seven doctors. All of them seem to acknowledge that Mr. Mikkel has got some problem in their specialized field, but it just seemed to me that there was never any consideration of his cumulative problems. I mean, is that permitted? Is that desirable? I think it's not ruled out. I would agree with you that the record is devoid of evidence addressing or establishing that he's totally and permanently disabled due to cumulative impact. I didn't say that. I didn't say that record is devoid of evidence that he's totally and permanently disabled. I didn't see that. What I'm asking you is, is there anywhere in the record that you can show me where they took the opinion of an orthopedist, for example, and then considered it together with people that were examining the psychological problems, for example? I can't point to that in the record, and I guess my response to this cumulative effect argument is that the plan-neutral physicians limit their opinions to their respective areas of expertise, and I think that's to be expected. And just based on this record, under the standard of review, I don't think it was unreasonable or certainly irrational for the board to conclude that negative findings across all the plan-neutral reports didn't add up to a positive conclusion that he was totally and permanently disabled. And that was my reference, Your Honor, to sort of the void of evidence. Plaintiffs are critical of the plan-neutrals or the board for not evaluating the cumulative effect, but there is no record evidence credibly supporting the cumulative effect point. I'm going to try my interest in this topic of whether the plan treats active players different than retired players. So it seems like to me that the plan allows for a social security determination of disability to play a larger role in evaluating disability claims of an active player than of a retired player. Am I right about that? No, Your Honor. And let me, if a player is actively playing football, he wouldn't be entitled to, he wouldn't be applying and he wouldn't be entitled to disability benefits. Okay. Thanks for your help. I mean, I understand that. What I'm saying is if somebody is disabled during the time that they're an active football player as opposed to someone who comes in years after their retirement, does the role of a social security ruling, is it treated differently by the board? No, I want to, I think I'm understanding what you're asking. The plan has different levels of total and permanent disability benefits. And I believe in Mr. Mickle's case, the level that they receive depends on the amount of time they've been out of the league essentially just to boil it down. So that will affect the monetary value perhaps of the benefit a player might be entitled to receive. But if I'm understanding your question, a social security award and the route to eligibility under that SSA provision in the plan is the same across all four benefit categories. And I'm hearing silence. Did I answer your question or should I just move on? You did fine. Thanks, Mr. Junk. Okay. And if I have time, I did want to address Mr. Mickle's what I call the $30,000 provision argument. It's a unique provision in this collectively bargained plan. I think it's unambiguous on its face. It says in part that a participant, a player, won't be deemed to be able to work merely because he has some earned income up to $30,000. My understanding is, and the way it's been interpreted, it allows players with some income, such as signing autographs, making celebrity appearances, that happens with this population of folks. The mere receipt of some income won't be an absolute bar to T&T benefits. But as we explained in the brief, the player still has to meet the NE occupation standard. And to just put a fine point on how it applied here, Mr. Mickle wasn't deemed to be employable merely because he had some income. He was found to be employable and therefore not entitled to benefits based on the opinions of seven plan-neutral physicians. So, if the panel has no further questions, I will end my argument. Thank you. May it please the court, Alyssa Paulina Grisham for Darren Mickle again. Your Honor, going back to addressing the cumulative effect argument, nothing in the policy permitted the plan to consider Mr. Mickle's impairments in isolation. And its failure to consider the combined impact of all of Mr. Mickle's conditions was neither a full nor fair evaluation of the evidence. Going back to the Faber analysis that we spoke of, again, the plan, Dr. Faber indicated that Mr. Mickle could only do one job with his particular set of psychological difficulties, which Dr. Faber noted he had. That was assisting in a sports program for the youth. Now, the plan never went back and assessed whether Mr. Mickle actually had the physical ability to handle the demands of that job, given its own evaluator's opinion that he was limited to short distance of walking. He had to alternate sitting and standing, could only walk short distances, and Dr. Dunn indicated was limited to sedentary activity. A truly full and fair review required the plan to finish its analysis to consider whether the combined impact of all of Mr. Mickle's impairments justified a disability finding, even if no single impairment rendered the same conclusion. And again, going back, the Seventh Circuit found in Laco versus Mutual of Omaha that the plan's failure to consider and address how the combination of all of the impairments together allowed him to meet the definition of disability amounts to arbitrary decision making because the review just wasn't completed. Is that a determination that the board itself has to make? Because I take Mr. Junk's representation that the individual physicians are going to be limited to their areas of expertise and very reluctant to provide opinions outside of those areas. Absolutely, Your Honor. Who makes that call? The plan does. The plan's continued focus on the confines of its evaluator's reviews is misplaced because the issues before this court involved the plan's review. The plan is the fiduciary with the discretionary authority, and it was the plan that failed to complete its review. The plan has the obligation to consult with appropriate professionals, and if the plan desires to do so, it can even ask those professionals to provide siloed evaluations. However, it has been the plan's responsibility to go back, put all the opinions and evidence together, and assess whether Mr. Nickel could actually work under the definition with all of his various impairments. Nothing in the plan allowed this administrator to consider Mr. Nickel's impairments in a silo. But the administrator is the six-person board, is it not? Yes, Your Honor. So three former NFL players and three representatives from management. Yes, Your Honor. And the board was required to render the decision. They're not allowed to just defer to their hired evaluators. But the board here could have hired a vocational expert. If the board did not feel comfortable making this decision, this cumulative effect analysis, then it should have hired a vocational expert to do so. It could have had their doctors. It could have asked their doctors. Counselor, your time has expired. May I finish answering my question? Yes, Your Honor. I actually have a follow-up to this. Please, yes, finish your answer. Thank you. In this particular example, the board could have gone back to Arlesoras, Canizares, or Dunes, the paid evaluators for the plan, and asked whether Mr. Nickel had the physical ability to do the single job listed by Dr. Faber that he can do, assist in a sports program for the youth, and asked whether he actually could do that job with all of their impairments. The board could have then been in a position to make a decision whether he actually had the physical ability to do this, considering the cumulative impact of all of his impairments. I mean, this is Beryl Martin. There would have been a lot of ways for the board to get at that. I mean, Mr. Junk said, well, of course the doctors only opined in their area of expertise, and of course he's right about that. The board could have hired another, as you say, a vocational expert that considered all of the opinions collectively, and the board did not do that, did they? No, Your Honor. And it should be noted that the board actually asked each of its evaluators to determine whether Mr. Nickel was employable, and there's no indication in the record that any of their evaluators were vocational experts. So they asked them to consider information that's outside of their medical expertise. They just ignored, they just failed to then take it a step further and go back and assess whether Mr. Nickel actually had the physical ability to handle the one job that their only doctor indicated that he could do. All right. I understand your argument. Thank you very much. And that concludes our arguments for the week. I will talk to my colleagues in conference as soon as we can get there, and we appreciate the arguments this morning. Court is in recess. Thank you, Your Honor.